# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh, : 
               Appellant : 
                : 
          v. : 
                : 
Pittsburgh Joint Collective Bargaining : 
Committee (Seddon, Hlakonik, :   No. 848 C.D. 2019
Semplice and Chubarov, grievants) :   Submitted: October 13, 2020

BEFORE:   HONORABLE ANNE E. COVEY, Judge
                HONORABLE J. ANDREW CROMPTON, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE COVEY                              FILED: November 9, 2020

The City of Pittsburgh (City) appeals from the Allegheny County Common Pleas Court's (trial court) June 20, 2019 order affirming an arbitration award concerning grievances the Pittsburgh Joint Collective Bargaining Committee (Union) filed on behalf of Harold Seddon (Seddon), Stephen Hlakonik (Hlakonik), Marc Semplice (Semplice), and Dana Chubarov (Chubarov) (collectively, Grievants). The Arbitrator found the grievances of Seddon and Hlakonik to be arbitrable even though they were not filed in writing, and directed the City to rescind the disciplinary action imposed on all four Grievants based on the Arbitrator's conclusion that Grievants did not engage in a "wildcat strike," work stoppage, or interruption or impeding of work in violation of Section 4(E) of the Collective Bargaining Agreement (CBA) between the City and the Union, nor were Grievants

insubordinate and the City did not have just cause for imposing the discipline.[1] Upon review, we affirm.

The City and the Union are parties to a CBA, effective from January 1, 2018, through December 31, 2023. Reproduced Record (R.R.) at 121a-198a. Grievants were covered by the CBA for their employment with the City's Department of Public Works (DPW); Seddon and Hlakonik are members of Laborers Local Union 1058 (Laborers), and Semplice and Chubarov are members of Teamsters Local Union 249 (Teamsters). Arbitration Decision and Award (Arbitration Decision), December 23, 2018, at 29; R.R. at 80a.

## Facts

On February 21, 2018, Grievants were working an overnight shift from 10:00 p.m. to 6:00 a.m. "cold patching" potholes on Brownsville Road in the City. Arbitration Decision at 15; R.R. at 66a. About midway through their shift, foreman David Suchy (Foreman Suchy) told Grievants that more patching material was needed to complete the work during their shift. *Id*. at 29-30; R.R. at 80a-81a.

A dispute arose as to whether Grievants would complete their shift or Foreman Suchy would permit them to stop working and go home because they did not feel well. *Id*. at 31; R.R. at 81a. Grievants ultimately left the work site after a break and three of them - Hlakonik, Semplice, and Chubarov – around the same time, sent Foreman Suchy text messages informing Foreman Suchy that they were

---

[1] Section 4(E) of the CBA ("Responsibilities of the Parties") states, in pertinent part: "During the term of this Agreement there shall be no strikes, work stoppages, or interruption or impeding of work." Reproduced Record at 129a.

leaving and would be using their individual personal time for the remainder of the shift. *Id*. at 30; R.R. at 81a.

The next day, the City issued Notices of Possible Disciplinary Action to Grievants, and after an investigation, suspended them for five days without pay. Arbitration Decision at 30; R.R. at 81a. The Teamsters filed written grievances with the City on behalf of Semplice and Chubarov. *Id*. The Laborers raised grievances with the City on behalf of Seddon and Hlakonik, but they were not formally filed in writing. *Id*. The grievance process failed to resolve the dispute and the matter went to arbitration. *Id*. In addition to the merits of the dispute, the City raised the issue of whether Seddon and Hlakonik's grievances were eligible for arbitration, since, although the grievances proceeded through the grievance process, their original grievances were not in writing. *Id*. An Arbitrator held a hearing on October 23, 2018. *Id*. at 14; R.R. at 65a.

**Arbitrator Hearing**

Seddon, a 19-year employee, testified that he told Foreman Suchy at the beginning of his shift that he did not feel well; he did not refuse to work, and later during the shift again informed Foreman Suchy that he did not feel well and "felt nauseated[,]" that he was going home, and that he would use personal time for his absence. Arbitration Decision at 18; R.R. at 69a. Seddon stated that Foreman Suchy advised him that if he did not want to work anymore, "then to [expletive] off." *Id*.; R.R. at 69a. In addition, Seddon explained that although he told Foreman Suchy he was leaving because he did not feel well, he did not refuse to work nor did he tell the other Grievants to abandon the jobsite and follow him; Seddon also noted that Foreman Suchy never notified him when he left that he needed a doctor's note. *Id*.

3

at 19; R.R. at 70a. Seddon reported that he went back to the office, filled out paperwork, went home, took over-the-counter medication, went to sleep, and returned to work the next day. *Id*. at 18; R.R. at 69a.

Hlakonik, a 16-year employee, explained in a written statement that he and the others laid eight tons of patch in four hours during their shift, then discussed how they all were not feeling well and thought it might be a "flu bug." *Id*. at 5, 18-19; R.R. at 56a, 69a-70a. When Foreman Suchy told them to get more patching material they discussed how it might be better to stop, go home for medicine and rest, and "hit it again the next night, which all [Grievants] did. I recall no refusal not to continue work. [Foreman] Suchy was aware of how we all were feeling and said 'if that's how you guys are feeling, just go home.'" *Id*. at 5; R.R. at 56a.

In his testimony, Hlakonik stated that he did not feel well about midway through the shift. Arbitration Decision at 19; R.R. at 70a. Hlakonik talked with Seddon and they discussed taking a quarter of a day of leave, but did not talk to the other Grievants or try to influence them to leave. *Id*. Hlakonik then told Foreman Suchy he wanted to leave with Seddon because he also was not feeling well. *Id*. Hlakonik reported that Foreman Suchy did not instruct him to stay, he did not ask for a doctor's note, or tell him he would face discipline if he left; instead Foreman Suchy told him[,] "I do not give a [expletive] what you do." *Id*. Hlakonik sent a text at 3:21 a.m. to Foreman Suchy and informed him he was leaving. *Id*. at 33-36; R.R. at 84a-87a. Hlakonik went to the office, went home, and returned to work the next day. *Id*. at 19; R.R. at 70a.

Chubarov, a 12-year employee, testified that she had already been out sick twice that month, but was trying to "suck it up" that night. *Id*. at 21; R.R. at 72a. Chubarov was in her truck after the break when Foreman Suchy came up to the

4

door, scaring her, and asked her if she was getting another load of patching material or "going home with the rest of the crew." *Id*. Chubarov testified that she did not discuss leaving with the others; Foreman Suchy did not tell her to get a doctor's note or that she would be disciplined if she left; Chubarov believed she was given the option to leave and did so because she did not feel well. *Id*. at 21-22; R.R. at 72a-73a. As she had done before without incident, Chubarov sent Foreman Suchy a text to tell him she was taking personal time off for the rest of the shift. *Id*. at 22; R.R. at 73a.

Semplice, a 10-year employee, explained in his written statement that "I was exhausted due to working a lot of overtime that week. I was helping shovel asphalt and the fumes from the vehicle were making me lightheaded and nauseous." Arbitration Decision at 6; R.R. at 57a. When Semplice told Foreman Suchy he felt ill, Foreman Suchy responded that "if we could not finish [the work that evening] that we should go home. At that point, I went home sick with the rest of the crew." *Id*.

In his testimony, Semplice stated that he volunteered to work as a laborer on the shift that night. *Id*. at 20; R.R. at 71a. He noticed that Chubarov did not feel well at the beginning of work. *Id*. Semplice testified that he started the shift feeling normal, but the weather was warm and he was sweating from the work; after a few hours, he did not feel well either. *Id*. at 20; R.R. at 71a. Semplice explained that after a break, he talked with Foreman Suchy, who gave him the choice to either go home sick or continue working; Foreman Suchy did not tell him he needed a doctor's note or that he would be subject to discipline if he left. *Id*. Semplice reported that he went back to the office, completed paperwork, and sent Foreman Suchy a text that he was going home sick. *Id*. Semplice further testified that he went

5

home, took fluids, went to bed, and returned to work the next day. *Id*. at 20-21; R.R. at 71a-72a.

Foreman Suchy related that at about 1:30 a.m., after a break, he proceeded as if he and Grievants were going to continue working and he told Chubarov to get more patching material. Arbitration Decision at 15; R.R. at 66a. Foreman Suchy explained that Semplice and Seddon did not ask permission to leave, but rather told him they were not working anymore that night and were going to use personal time for the rest of the shift. *Id.* He stated that he got text messages from three of the Grievants that they were taking half days for the rest of the shift. *Id*. Foreman Suchy testified that none of the Grievants looked sick or told him they did not feel well. *Id*. at 15-16; R.R. at 66a-67a. He acknowledged, however, that "he cannot stop anyone from taking time [the worker] has available," and that employees have left in the past by sending text messages or calling and have not been disciplined. *Id*. at 15-16; R.R. at 66a-67a. Foreman Suchy confirmed that did not tell Grievants they could be disciplined if they left. *Id.*

Philip Ameris, Jr., a staff representative for the Laborers (Union Representative Ameris), acknowledged at the October 2018 hearing that no written grievance for either Seddon or Hlakonik appeared to have been made. Union Representative Ameris further testified that even though no written grievance was filed, in the past the City responded to and addressed non-written grievances and that the City did not raise the issue here throughout the grievance process. *Id*. at 17-18; R.R. at 68a-69a.

After considering the evidence, the Arbitrator found that despite the lack of a formal written grievance in the cases of Seddon and Hlakonik, the City did not raise the issue in a timely manner and had a history of accepting verbal

6

grievances; therefore, those two matters were arbitrable and eligible for a determination on the merits. *Id*. at 31-35; R.R. at 82a-86a. The Arbitrator found in favor of Grievants on the merits and ordered the City to rescind the five-day suspensions, which the Arbitrator found had been imposed without just cause. *Id*. at 32-39; R.R. at 83a-90a.

The City appealed to the trial court, which affirmed the Arbitrator's award. The City appealed to this Court, raising the following issues:

> 1. The Arbitrator ignored the written terms of the [CBA] when she ruled on the merits of unwritten grievances by the Union for [] Seddon and [] Hlakonik over the City's objections.
>
> 2. The Arbitrator ignored the written terms of the [CBA] when she ruled directly contrary to the section of the contract that addresses when the City can require a [d]octor's certificate.
>
> 3. The Arbitrator abused her discretion by engaging in conclusory and contradictory remarks saying there was "no evidence" and that the record was "devoid of evidence" (that [Grievants] engaged in any concerted work stoppage) despite her findings of fact based on undisputed Union testimony and stipulated Exhibits.

City Br. at 15, 23, 28.

## Discussion

The law is well established that appellate review of a grievance arbitration award is conducted pursuant to the highly deferential two-part essence test based on the reasoning that "[a]n arbitrator's award must be sustained 'if it is based on anything that can be gleaned as the 'essence' of the [collective bargaining

7

agreement].'" *Pa. State Sys. of Higher Educ. v. Ass'n of Pa. State Coll. & Univ. Faculties*, 98 A.3d 5, 14 (Pa. Cmwlth. 2014) (quoting *Am. Fed'n of State, Cty. & Mun. Emps., Dist. Council 84, AFL–CIO v. City of Beaver Falls*, 459 A.2d 863, 865 (Pa. Cmwlth. 1983)). The test is administered as follows:

> 'First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement.' [*State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. & Univ. Pro. Ass'n (PSEA-NEA)*], 743 A.2d [405,] 413 [(Pa. 1999)]. We explained: 'That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.' *Id.*

*Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA*, 939 A.2d 855, 863 (Pa. 2007). "The essence test does not permit this Court to vacate an arbitrator's award even if we disagree with the arbitrator's interpretation of the [collective bargaining agreement]." *Am. Fed'n of State, Cnty., & Mun. Emps., Dist. Council 87 v. Cnty. of Lackawanna*, 102 A.3d 1285, 1290 (Pa. Cmwlth. 2014). This means that the reviewing court may not disregard the arbitrator's findings of fact and credibility determinations, which are considered final. *See Pa. State Police v. Pa. State Troopers' Ass'n (Keyes)*, 54 A.3d 129 (Pa. Cmwlth. 2012).

"The essence test is an exceptionally deferential standard, because binding arbitration is a highly favored method of dispute resolution." *Dep't of Corr., State Corr. Inst. at Forest v. Pa. State Corr. Officers Ass'n*, 173 A.3d 854, 858 (Pa.

8

Cmwlth. 2017). The party challenging an arbitration award bears the "burden of proving the award does not draw its essence from the [collective bargaining agreement]." *Pa. State Sys. of Higher Educ.*, 98 A.3d at 14.

**Procedural Arbitrability**

The City first argues that Seddon and Hlakonik's grievances were not arbitrable. The City contends that the Arbitrator erred in finding their grievances, which were not commenced using the standard written format set forth in the CBA, were eligible for arbitration on the merits. The City asserts that the Arbitrator wrongly disregarded language in Section 5 of the CBA ("Grievance Procedure") that requires grievances advancing beyond the relatively informal Step I phase to be submitted for Step II in writing on a standard grievance form. The CBA further provides that an appeal to Step III must also be in writing. CBA at 12; R.R. at 132a. The City contends that because Seddon and Hlakonik's grievances were not originally submitted in writing, the Arbitrator did not have subject matter jurisdiction to consider and rule on the merits of their cases because Section 6 of the CBA ("Arbitration") states: "Any grievance processed in accordance with" Section 5 may be appealed to arbitration. City Br. at 10-12.

The City maintains that while all grievances must be considered during the grievance process even if they are procedurally noncompliant, a noncompliant grievance may not proceed to arbitration due to its procedural flaws and any waiver by the City must have been express and not implied by its failure to raise the issue at the first instance when the matter proceeded to Step II. Because the Arbitrator here elected to hear Seddon and Hlakonik's grievances despite their noncompliance with the CBA terms requiring a written form, the City argues the Arbitrator violated

9

Section 6 of the CBA, which provides that an arbitrator may not "add to, subtract from, modify, or disregard" any terms or provisions of the CBA. City Br. at 10-12, 15-23.

The Union responds that the Arbitrator was within her authority to consider the City's past practices of processing non-written grievances and that doing so did not amount to a unilateral disregard or modification of the CBA terms concerning written grievances. Union Br. at 11-12.

"The arbitrator has sole and exclusive jurisdiction to hear disputes . . ., including the dispute as to whether the grievances . . . are arbitrable." *Abington Heights Sch. Dist. v. Pa. Labor Rels. Bd.*, 709 A.2d 990, 994 (Pa. Cmwlth. 1998). The arbitrability of Seddon and Hlakonik's grievances clearly meets the first step in the essence test as it is expressly addressed within the CBA's terms. The inquiry thus turns on the second step, whether the Arbitrator's conclusion that the grievances were arbitrable may be rationally derived from the CBA.

Our Supreme Court has explained:

Under the second prong, we ask whether the award itself can rationally be derived from the [collective bargaining agreement]. Here, again, we emphasize that the parties to a [collective bargaining agreement] have agreed to allow the arbitrator to give meaning to their agreement and fashion appropriate remedies for 'unforeseeable contingencies.' [*United Steelworkers of Am. v.*] *Warrior & Gulf Navigation Co.*, 363 U.S. [574,] 578-79 [(1960)]. . . . The words of the [collective bargaining agreement] are not 'the exclusive source of rights and duties.' *Id.* . . . The arbitrator is authorized to make findings of fact to inform his interpretation of the [collective bargaining agreement]. *United Paperworkers* [*Int'l*] *Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 . . . (1987) (*Misco*).

10

> Accordingly, even though an arbitrator is not permitted to ignore the [collective bargaining agreement's] plain language in fashioning an award, the arbitrator's understanding of the plain language must prevail. A reviewing court 'should not reject an award on the ground that the arbitrator misread the contract.' *Misco*, 484 U.S. at 38[.] . . . The law is clear that an arbitrator's award must draw its essence from the [collective bargaining agreement]. It need not [] reflect the narrowest possible reading of the [collective bargaining agreement's] plain language. Even if a court's interpretation of the [collective bargaining agreement] is entirely different than the arbitrator's, the award must be upheld so long as it rationally derives from the [collective bargaining agreement].

*Millcreek Twp. Sch. Dist. v. Millcreek Twp. Educ. Support Pers. Ass'n*, 210 A.3d 993, 1006 (Pa. 2019) (citations omitted).

In addressing this issue, the Court must determine whether the Arbitrator erred in considering the City's past practice of accepting and litigating grievances presented verbally, which it also did here initially for Seddon and Hlakonik, and finding these grievances arbitrable on the merits. Generally, "a past practice cannot be used where it is proscribed or conflicts with the language of the current collective bargaining agreement." *Dep't of Corr. v. Pa. State Corr. Officers Ass'n*, 38 A.3d 975, 982 (Pa. Cmwlth. 2011). However, our Supreme Court has stated that an arbitrator's award may draw its essence from the collective bargaining agreement if the arbitrator's "interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, **and any other indicia of the parties' intention**." *Danville Area Sch. Dist. v. Danville Area Educ. Ass'n, PSEA/NEA*, 754 A.2d 1255, 1260 (Pa. 2000) (emphasis added) (quoting *Cheyney Univ.*, 743 A.2d at 411).

11

Thus, an arbitrator is not necessarily confined to the express terms of a collective bargaining agreement and, when appropriate, may have latitude to consider evidence outside the four corners of the agreement.

> [U]nlike the trial court setting in which the judge will admit extraneous evidence for the jury's consideration only after a determination that a contract is ambiguous, the distinction between ambiguous and unambiguous agreements is of no evidentiary significance in the labor arbitration context.

*United Sch. Dist. v. United Educ. Ass'n*, 782 A.2d 40, 44-45 (Pa. Cmwlth. 2001).[2]

> In *Danville Area School District*, our Supreme Court expounded:
>
> More specifically with regard to past practice, as stated in Frank and Edna Asper Elkouri's seminal work on arbitration, *How Arbitration Works*[:]
>
> > Unquestionably custom and past practice constitute one of the most significant factors in labor-management arbitration. Evidence of custom and past practice may be introduced for any of the following major purposes: (1) to provide the basis for rules governing matters not included in the written contract; (2) to indicate the proper interpretation of ambiguous contract language; or (3) to support allegations that clear language of a written contract has been amended by mutual action or agreement.
>
> Elkouri and Elkouri, *How Arbitration Works* 437 (4th ed. 1988).

---

[2] *See also United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-82 (1960) ("The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law - the practices of the industry and the shop - is equally a part of the collective bargaining agreement although not expressed in it.").

*Danville Area Sch. Dist.*, 754 A.2d at 1260 n.2. To this point, in *Millcreek Township School District*, our Supreme Court reinstated an arbitrator's "reading of the [collective bargaining agreement] that was informed by his understanding of the parties' history and the context" of their dispute. *Id.* at 1006.

Here, the CBA sets forth agreed-upon procedures for written grievances. Step I requires only that the employee "discuss it" with his or her supervisor. CBA at 12; R.R. at 132a. But escalation to Step II "shall be presented in writing . . . on a standard grievance form" to the superintendent or a designated representative of the bureau in which the employee works, and "[a] grievance is deemed to be filed when the employee first submits it in writing on a standard grievance form." CBA at 12-13; R.R. at 132a-33a. Further processing to Step III is to be accomplished by means of a "written appeal." CBA at 13-14; R.R. at 133a-34a.

If the matter remains in dispute, arbitration is the next step. The CBA states: "Any grievance that has been processed in accordance with the provisions of [Section 5 of the CBA], but not satisfactorily settled shall be submitted to arbitration . . . ." CBA at 17; R.R. at 137a. The City asks that these provisions be strictly construed in this matter in order to block Seddon and Hlakonik's grievances from arbitration on the merits.

However, the introductory paragraph of Section 5 of the CBA also states: "[A]ny time limit or written format provided in the grievance procedure may be changed by mutual agreement of the parties . . . . The parties agree that no grievance will be accepted unless submitted on this form unless the parties agree otherwise." CBA at 12; R.R. at 132a.

Thus, the question before the Arbitrator was whether the City's failure to oppose Seddon and Hlakonik's unwritten grievances for procedural noncompliance at Step II of the grievance process, both in the past and here, amounted to a tacit or implied "agreement" that their grievances could proceed to arbitration. As such, the Arbitrator considered the unrefuted testimony of Union Representative Ameris who testified that the City did not object to Seddon and Hlakonik's unwritten grievances at Step II, and had not objected in the past to processing verbal grievances in other cases. Arbitration Decision at 17-18; R.R. at 68a-69a. Based on this testimony, the Arbitrator concluded that in light of the City's failure to object at the outset of the process here, and its past practice of litigating unwritten grievances "on numerous occasions," there was no procedural bar to the arbitrability of these claims. Arbitration Decision at 31-32, 34-35; R.R. at 82a-83a, 85a-86a.

This Court concludes that the Arbitrator's determination of arbitrability with regard to Seddon and Hlakonik's grievances is rationally derived from the CBA. The City's argument that the writing requirements in Section 5 of the CBA should be strictly construed here against Seddon and Hlakonik is belied by its past practice of accepting and litigating verbal grievances, but also by the language contained in Section 5 of the CBA that the procedural requirements may be amended by agreement of the parties, and nothing in the CBA states that such agreement must be express. The narrowest reading of the CBA is also not required. *See Millcreek Twp. Sch. Dist.* Thus, the City's practice of accepting and litigating verbal or otherwise informal grievances in the past and here, by not objecting at Step II, indicates tacit or implied agreement that the written requirements for grievances need not always be followed.

14

Moreover, contrary to the City's assertions, the Arbitrator did not neglect, modify, or disregard the terms of the CBA when she found Seddon and Hlakonik's grievances arbitrable on the merits. Her decision to consider the merits of their grievances meets the requirements of the essence test: it is encompassed within the terms of the CBA and is rationally derived from those terms.[3]

**Medical Documentation**

The City next argues that on the merits of Grievants' cases, the Arbitrator erred in not finding that Grievants' failure to provide medical documentation for their asserted illnesses on the night of the incident violated the CBA. Section 12(E)(3) of the CBA ("Sickness and Accident Leave") states: "A [d]octor's certificate only may be required for an absence from work due to sickness for four (4) or more consecutive workdays, or when the City believes the absence from work to be the result of abuse." CBA at 41; R.R. at 161a. The City maintains that in light of Foreman Suchy's testimony that none of the Grievants looked sick or told him they were sick during their shift, the City reasonably suspected Grievants had committed sick leave abuse and therefore was within its authority to seek medical documentation after the fact, and that Grievants' noncompliance with the request violated the CBA. City Br. at 23-28.

The Union responds that the City improperly asks this Court to substitute its own evidentiary determinations and conclusions outside of longstanding judicial deference to arbitrators' factual determinations and contract

---

[3] The City's related assertion that the Arbitrator did not have contractual subject matter jurisdiction or legal power over this dispute beyond determining arbitrability in the first instance also fails. In light of the Arbitrator's supported and rational conclusion that Seddon and Hlakonik's grievances were in fact arbitrable, to then conclude that she lacked authority to actually decide the merits would be nonsensical.

15

interpretations. The Union points to the Arbitrator's conclusion that Grievants' departure from work and use of their personal leave time in lieu of working the rest of their shift that night was justified under and rationally derived from the CBA. Section 12(D)(2) of the CBA states: "Personal [l]eave time off must be requested in writing on a form provided by the City at least seventy-two (72) hours in advance of the time requested unless due to sudden illness or emergency." Union Br. at 12-15; CBA at 38-39; R.R. at 158a-59a.

The Arbitrator considered the testimony of Grievants as well as that of Foreman Suchy, and effectively found Grievants more credible. The Arbitrator concluded that Seddon "was not feeling well and informed his [f]oreman he was leaving work and using time he had available. . . . The [f]oreman did not instruct [] Seddon that he needed a doctor's excuse to return to work the next day." Arbitrator's Decision at 33; R.R. 84a. Similarly, the Arbitrator found that Hlakonik

> was not feeling well and wanted to leave work. . . . He was not instructed when he left early [that] he needed to return to work with a doctor's slip or that he needed 72 hours of notice before he took time off from work. . . . The language of the CBA did not require him to produce a doctor's slip based on the circumstances.

*Id*. at 35-36; R.R. at 86a-87a.

Likewise, the Arbitrator determined that Semplice "left work because he was not feeling well. . . . He had time available to cover his absence. He was not told when he initially left [that] a doctor's slip would be required to cover his absence." *Id*. at 37-38; R.R. at 88a-89a. The Arbitrator also found that Chubarov left work because "she did not feel well. . . . She was not told she failed to give a 72-hour notice or initially that a doctor['s] slip was required because of the CBA requirements of one of sick abuse or high frequency." *Id*. at 38-39; R.R. at 89a-90a.

16

The resolution of this issue is also subject to the essence test. A reviewing court may not second guess the arbitrator's factual and credibility determinations, but may only inquire whether the issue and the arbitrator's decision derive rationally from the CBA. *See Millcreek Twp. Sch. Dist.*; *Pa. State Sys. of Higher Educ. (Cheyney Univ.)*; *Danville Area Sch. Dist*.

This Court notes that the Arbitrator did not specifically address the City's CBA Section 12(E)(3) claims concerning Grievants' alleged "abuse" of sick time, but it is clear from the Arbitrator's Decision that she rejected them in light of finding that Grievants had not violated Section 12(D)(2) of the CBA when they used available personal sick time to cover the rest of their shifts that night. The sick time issue is clearly encompassed within the CBA's terms, whether in Section 12(D)(2) or Section 12(E)(3) of the CBA. CBA at 38-39, 41; R.R. at 158a-59a, 161a. The Arbitrator expressly determined that Grievants complied with the former, and tacitly found they had not violated the latter. Thus, there is no question that the issue meets the first step of the essence test.

The Court must next consider whether the Arbitrator's conclusion that the City did not have just cause for disciplining Grievants for not providing doctors' notes either before or after their absences is also rationally derived from the CBA and meets the second step of the essence test. The Arbitrator evaluated and weighed the evidence, including testimony from Grievants and the City's witnesses, and expressly found that Grievants' illnesses constituted valid and non-abusive use of personal leave time on an *ad hoc* basis without 72 hours of notice, which is permitted by the personal leave time provision in Section 12(D)(2) of the CBA. The Arbitrator's finding of non-violation of that section of the CBA certainly arises rationally from the CBA's terms. The Arbitrator's conclusion that the City did not

17

have just cause for disciplining Grievants for not providing doctors' notes either before or after their absences is rationally derived from the CBA and meets the second step of the essence test.

To the City's argument that Grievants' actions may nevertheless have violated the sick leave section of the CBA, this Court is constrained to note that the Arbitrator found Grievants' conduct acceptable under the personal leave section, and there is no basis in our precedent to reverse an arbitrator's award based on "cherry picking" of a given CBA. *See Johnson v. Pa. Nat'l Ins. Cos.*, 594 A.2d 296, 299 (Pa. 1991) ("As such, it seems inequitable to permit appellee to pick and choose those contract provisions she prefers while not granting that same latitude to the named insured.").

This Court agrees with the Union that, in essence, the City is challenging the sufficiency of the evidence upon which the Arbitrator made certain conclusions. The Arbitrator's decision was entirely based upon findings of fact and credibility determinations and satisfied the standards of the highly deferential essence test. Accordingly, there is no basis for this Court to step in.

**Work Stoppage or Wildcat Strike**

Next, the City argues that the Arbitrator wrongly concluded that Grievants did not engage in a concerted work stoppage or wildcat strike.[4] The City points to: Hlakonik's statement that he and Seddon discussed how they both did not feel well and decided to "call it quits" and use personal leave time for the remainder of the shift; Semplice's statement that Grievants agreed they were not feeling well

---

[4] The City provides the definition of "wildcat strike" as a work stoppage that occurs without approval of union leadership and in violation of a no-strike collective bargaining agreement provision. City Br. at 6 (citing https://definitions.uslegal.com/w/wildcat-strike/).

18

and would send Foreman Suchy a text advising him that they were taking personal time for the rest of the shift; and Foreman Suchy's testimony that Grievants did not appear sick to him or tell him they did not feel well until he received same-time texts from three of them advising him they were not returning. City Br. at 28-31 (citing Arbitrator's Decision at 15, 19-23).

The City adds that even if Grievants did not conspire to stop working that night, discipline was warranted even if they all coincidentally decided to leave work because both the Public Employe Relations Act (PERA)[5] and the CBA prohibit public employees from refusing to work. City Br. at 32-33 (citing Section 1201(b)(7) of PERA, 43 P.S. § 1101.1201(b)(7) ("Unfair practices by public employers and employe organizations; acts prohibited"); Section 4 of the CBA ("Responsibilities of the Parties")).

The Union responds that the Arbitrator clearly credited Grievants' testimony that they concurrently felt or became ill during their shift, that they did not conspire to create a work stoppage or wildcat strike, that they were told by Foreman Suchy that they could stay or go home, and that Foreman Suchy never advised them if they left they would be subject to disciplinary action. Union Br. at 13-17.

Concerning the first step of the essence test, the question of whether Grievants engaged in an improper work stoppage or wildcat strike or, as the Arbitrator found, left work due to legitimate illnesses, is clearly encompassed within the CBA's terms. This issue comes within any one of the following sections: Section 3 of the CBA ("Management"), which states that the City "shall have the right to manage and direct the working forces including the right to schedule and assign

---

[5] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301.

work to be performed" but that the City may not impose discipline except for "just cause"; Section 4 of the CBA ("Responsibility of the Parties"), which states "there shall be no strikes, work stoppages, or interruption or impeding of work"; or Section 12(D)(2) of the CBA, which governs personal leave time. CBA at 8-9, 39; R.R. at 128a-29a, 159a.

The Arbitrator's conclusion that there was no improper work stoppage or wildcat strike here also meets the second step of the essence test as her decision is rationally derived from the CBA's terms. The Arbitrator evaluated and weighed the evidence, including testimony from Grievants and the City's witnesses, and expressly found that Grievants' actions did not rise to the level of a wildcat strike or other improper work stoppage prohibited by the CBA.

Regarding Seddon, the Arbitrator concluded: "There was not just cause to discipline this grievant," "he did not act insubordinate[,]" and "while [Grievants] may have discussed that [] Seddon was leaving work, there was no evidence [that] his action constituted a concerted activity such as a wildcat strike." Arbitrator's Decision at 33; R.R. at 33a.

Concerning Hlakonik, the Arbitrator concluded: "[T]he City did not have just cause to discipline this grievant," he "was not insubordinate because he was not told to stay on the job," his "actions of leaving work early did not constitute a wildcat strike. He did not encourage others to leave work" but rather "only discussed he was leaving early with [Seddon]." *Id*. at 36; R.R. at 87a.

Likewise, the Arbitrator found Semplice "did not act insubordinate" as he was told by Foreman Suchy that he had the choice to leave. *Id*. at 37; R.R. at 88a. Moreover, "the evidence is devoid of proof he convinced other employees to leave work early to cause a wildcat strike. . . . [Semplice] left work because he was not

20

feeling well. . . . He had time available to cover his absence." *Id*. at 37-38; R.R. at 88a-89a.

Finally, the Arbitrator concluded that Chubarov's actions of leaving work when given the option to do so by Foreman Suchy "do not rise to the level of her being disciplined in this matter." *Id*. at 39; R.R. at 90a. She discussed with the others that "they needed to tell the [f]oreman individually [that] they planned to leave" after he gave them the option to do so, but this did not mean she "conspired to leave early to cause a wildcat strike." *Id*.

The Arbitrator clearly credited Grievants' testimony over that of Foreman Suchy and made her determinations within her understanding of the CBA terms "just cause," and "strikes, work stoppages, or interruption or impeding of work." CBA at 8-9; R.R. at 128a-29a. Credibility determinations are within the sole province of the arbitrator and are beyond the scope of our review. *Keyes*. Thus, there is no basis for this Court to disturb the Arbitrator's conclusions. This Court therefore concludes that the Arbitrator's determination that Grievants' actions did not rise to a strike or other improper work stoppage or impediment of work, and the City did not have just cause to impose discipline, met the essence test.

**Public Policy Exception**

The City argues that even if the Arbitrator's award meets the essence test, it should be set aside under the public policy exception. The City maintains that Grievants' leaving the job in mid-shift undermines public safety and welfare and that affirming the Arbitrator's decision will "incentivize public servants to hold the public hostage to their whims." City Br. at 33-37. The Union responds that the facts here do not rise to meet the very narrow circumstances in which the public policy

21

exception is warranted because the Arbitrator correctly found that Grievants did not engage in illegal work stoppage, but rather took permissible personal leave time. Union Br. at 15-17.

"In cases where a court finds that the essence test is satisfied, the court may then consider whether the award violates a well-defined and dominant public policy of the Commonwealth." *Pa. State Sys. of Higher Educ., Lock Haven Univ. v. Ass'n of Pa. State Coll. & Univ. Faculties*, 193 A.3d 486, 498 (Pa. Cmwlth. 2018), *appeal denied*, 203 A.3d 980 (Pa. 2019). The public policy exception requires satisfaction of the following three-part test:

> First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is 'well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.' . . . Third, we must determine if the arbitrator's award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the factual findings of the arbitrator.

*Id*. (quoting *Neshaminy Sch. Dist. v. Neshaminy Fed'n of Tchrs.*, 171 A.3d 334, 338 (Pa. Cmwlth. 2017) (*en banc*)).[6] "The burden of establishing a violation of public policy rests on the party asserting the public policy exception." *Id*. "Whether the

---

[6] We note that in *Millcreek Township School District*, our Supreme Court considered the public policy exception in the context of whether a school district's issuance of requests for proposals to outside custodial work companies violated its collective bargaining agreement with its custodial workers' union. 210 A.3d at 1006. In that context, the Court adjusted the test slightly to consider whether the arbitrator's remedy of barring the school district from using outside custodial contractors violated public policy. The Court implied, however, that in the context of employee discipline grievances, the extant test focusing on the nature of the underlying conduct leading to the discipline remained in effect. *Id*. at 1010-11.

22

public policy exception to the essence test applies in a given case is a question of law subject to plenary, *de novo* review." *Id.*

Here, the City asserts that the well-defined, dominant public policy is that wildcat strikes and illegal work stoppages by public workers undermines public safety and welfare. If Grievants' conduct amounted to a wildcat strike or other illegal work stoppage, it could possibly undermine public policy and cause the City to breach its duty to ensure public works, such as street repairs, are completed.

However, the Court must consider "the particular circumstances at hand and the factual findings of the arbitrator," who heard and observed the witnesses. *Pa. State Sys. of Higher Educ.*, 98 A.3d at 15. The Arbitrator's evaluation of the evidence, including the conflicting statements of Grievants and Foreman Suchy, led her to conclude that Grievants genuinely did not feel well, reported this to Foreman Suchy, got his permission to leave (however grudgingly), and properly used their personal leave time to account for their absence from the rest of their shift. The Arbitrator did not find their conduct amounted to a wildcat strike or any other improper, insubordinate, or concerted work stoppage. Arbitrator's Decision at 33-39.

As discussed above, this case rests almost entirely on the respective witnesses' credibility. The Court therefore remains constrained to accept the Arbitrator's factual determination that Grievants' conduct in leaving work early due to their asserted illnesses was not an illegal strike or work stoppage, but legitimate, and permitted by the CBA's personal leave provisions. Accordingly, the Court must also conclude that the legitimate nature of this conduct does not violate the public policy against wildcat strikes or improper work stoppages, and that the Arbitrator's award in Grievants' favor does not lead to an unacceptable risk or force the City to

23

breach its lawful obligations or public duty.  As such, the Arbitrator's award does not implicate the public policy exception to the essence test.

## **Conclusion**

Because the City has failed to establish that the Arbitrator's award does not draw its essence from the CBA and does not violate a well-defined and dominant public policy of the Commonwealth, the trial court's order is affirmed.


        _____
        ANNE E. COVEY, Judge


Judge Fizzano Cannon did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh,                          :
               Appellant          :
                                  :
           v.                        :
                                  :
Pittsburgh Joint Collective Bargaining   :
Committee (Seddon, Hlakonik,             :   No. 848 C.D. 2019
Semplice and Chubarov, grievants)        :

## O R D E R

AND NOW, this 9th day of November, 2020, the Allegheny County Common Pleas Court's June 20, 2019 order is AFFIRMED.

_____
ANNE E. COVEY, Judge